**UNITED STATES ex rel. TRAININ v. CAIN, Commanding Officer of Camp Upton, N. Y.**

**No. 418.**

Circuit Court of Appeals, Second Circuit.

Aug. 15, 1944.

Osmond K. Fraenkel, of New York City, for relator-appellant.

Vine H. Smith, Asst. U. S. Atty., of Brooklyn, N. Y. (Harold M. Kennedy, U. S. Atty., and Anthony G. Greco, Asst. U. S. Atty., both of Brooklyn, N. Y., on the brief), for respondent-appellee.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

Isaac Trainin, hereinafter called relator, was inducted into the armed forces on March 22, 1944, pursuant to the provisions of the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix, § 301 et seq. The same day his father, Rabbi Boruch Trainin, petitioned for a writ of habeas corpus in his behalf on the ground that this induction was unlawful, since he was entitled to a classification of IV-D and exemption from service as a "regular or duly ordained" minister of religion within the meaning of § 5(d) of the Act and Selective Service Regulation 622.44(a), (b), (c), and the writ duly issued. Upon return of the writ, the district court conducted a hearing on three separate days, and then dismissed the petition and quashed the writ in a written opinion dated April 28, 1944. This appeal followed.

Relator is a naturalized citizen of the United States, twenty-five years of age. When he first registered for selective service on October 16, 1940, he was attending Brooklyn College, Brooklyn, New York. Although shortly thereafter he entered St. John's Law School, also in Brooklyn, he stated in his selective service questionnaire in July, 1941, that he was a regular and duly ordained rabbi of the Hebrew Orthodox faith, and was accordingly, after the perfunctory investigation permitted by the limited facilities of his local board, placed in Class IV-D. This classification enabled him to continue the study of law, and in January, 1943, he received the degree of Bachelor of Laws. Several months later he took and passed the New York State Bar Examinations, and during the summer of 1943 served as law clerk to a New York City attorney. Meanwhile, however, doubts were arising regarding the correctness of his exemption from service. As the result of several anonymous communications questioning his standing as a rabbi, his local board re-examined his status in the spring of 1942, but nevertheless continued his IV-D classification. Then in June, 1943, New York City Selective Service Headquarters, pursuant to Selective Service Regulations 626.2(a), (b), and 627.1(a), (b), requested his file from the local board for the purposes of review. An investigator for Headquarters interviewed relator, and he was called before a special advisory panel on theological classifications composed of five eminent Hebrew professional men. When this entire panel reported unfavorably upon his claim for exemption, Headquarters so notified his local board, which thereupon placed him in Class I-A. The usual appeal to the board of appeal and several rehearings before the local board failed to alter this classification or prevent his final induction.

Relator has never attended any seminary in order to become a rabbi. Rather, his only training consisted of studying once a week for two years under Rabbi Jacob Mendelson of Newark and at other times under his father. In his original selective service questionnaire, filed in July, 1941, he stated that he had been ordained by Rabbi Mendelson on June 1, 1938, and had commenced rabbinical practices around January 1, 1939. At about the same time, he presented to his local board two certificates of ordination in the Talmudic language, one by Rabbi Mendelson and one by Rabbi Alexander Levine, both of which, when later translated, were shown to have been

dated June, 1940. Thereafter, in November, 1942, he alleged in his occupational questionnaire that he had been a rabbi since March, 1937; but before the advisory panel on theological classifications he stated that he had been ordained and had become a rabbi only in April, 1940. Shortly after the hearing before the panel he returned to Selective Service Headquarters and presented a third certificate of ordination, issued under date of June, 1939, by his father. Then in a letter to the appeal board he claimed to have been ordained by his father in the latter part of 1939, and by Rabbis Mendelson and Levine in May, 1940. Relator's local board received several communications from two rabbinical societies to the effect that he was a qualified member and rabbi; of one of these societies his father was president and Rabbi Levine was secretary. Several rabbis supported his claim before the local board, and four, in addition to his father, testified to his qualification at the hearing below.

Relator asserts that he is the regular rabbi of a congregation in Brooklyn founded by his father, the latter having retired in his favor towards the end of 1938. He also claims to be principal of a Hebrew school operated for children of members of the congregation. The congregation totals only 20 to 30 members, however, and the school has only 10 pupils. Further, there was evidence that his father is still considered the true rabbi of the congregation, and the certificate of ordination, dated June, 1939, by his father describes the latter as rabbi of the congregation, although he allegedly had retired the year before. Relator testified that he customarily performed marriage ceremonies, funerals, and memorial unveiling services for the congregation, but upon cross-examination admitted that he had officiated at only one wedding, the names of the principals of which he could not remember, and two unveilings. He did not file with the city clerk the certificate required to enable him to perform marriages until September 30, 1941, after the question had been raised by the board. Before the advisory panel he showed himself to be generally lacking in rabbinical lore and knowledge of the various Hebrew holy works and testaments.

Section 5(d) of the Selective Training and Service Act of 1940, upon which relator's claim of exemption is based, provides that "regular or duly ordained ministers of religion, and students who are preparing for the ministry in theological or divinity schools recognized as such for more than one year prior to the date of enactment of this Act, shall be exempt from training and service (but not from registration) under this Act." Selective Service Regulation 622.44(b) defines a "regular minister of religion" as "a man who customarily preaches and teaches the principles of religion of a recognized church, religious sect, or religious organization of which he is a member, without having been formally ordained as a minister of religion; and who is recognized by such church, sect, or organization as a minister." Subdivision (c) of the same Regulation defines a "duly ordained minister of religion" as "a man who has been ordained in accordance with the ceremonial ritual or discipline of a recognized church, religious sect, or religious organization, to teach and preach its doctrines and to administer its rites and ceremonies in public worship; and who customarily performs those duties." Section 10(a) (2) of the Act grants jurisdiction to the local boards to hear and determine "all questions or claims with respect to inclusion for, or exemption or deferment from, training and service" under the Act, and provides that "the decisions of such local boards shall be final except where an appeal is authorized in accordance with such rules and regulations as the President may prescribe."

On this appeal relator initially contends that the court below erred in admitting certain documents which were not received by his local board from Headquarters until March 19, 1944, since they were considered by neither local board nor appeal board in making his classification. But the record shows that the local board considered these documents at its meeting on March 20, 1944, two days before his final induction, and then declined to modify its former action. Further, the gist of their contents was included in the minutes of the hearing before the advisory panel, which were received by the local board before any change was made in his original IV-D classification. Turning then to the crux of the appeal, we are asked to reverse the unanimous findings by local and appeal boards—as well as the unanimous report of the advisory panel—that relator did not fall within the statutory exemption. The strength of relator's position is, of course, the support given to his claims by ministers of his own faith. He contends that the per-

sons qualified by knowledge to do so attest to the validity of his credentials, and that the only explicit evidence to the contrary received by the board was the suggestion of members of rival branches of his faith that his qualifications and ordination were not in accordance with their own requirements. The appeal, therefore, presents once again the question of the extent to which courts should review the findings of selective service boards—a question which even after the experience in decentralized military conscription afforded by two wars[1] remains not thoroughly settled, so far at least as borderline cases are concerned.

Undoubtedly the statutory provision that decisions of the selective service boards shall be "final" narrowly limits the scope of judicial examination of board actions; but it is clear that Congress through use of such words cannot deny any registrant the constitutional protections of due process of law. See Angelus v. Sullivan, 2 Cir., 246 F. 54, 63, and cases cited therein. Thus it is error reviewable by the courts when it appears that the proceedings conducted by such boards "have been without or in excess of their jurisdiction, or have been so manifestly unfair as to prevent a fair investigation, or that there has been a manifest abuse of the discretion with which they are invested under the act." Id. 246 F. at page 67.[2] But generalities of this nature, themselves pregnant with ambiguities, do not greatly assist to decision in particular cases, or specifically delimit judicial power to review evidence before the boards. On this latter point many cases, without sharp consideration of the issues, merely state the now usual rule of review applied to many administrative agencies, namely, that review of the facts is limited to ascertaining whether there is "substantial evidence" to support the findings of the agencies. Rase v. United States, 6 Cir., 129 F.2d 204, 207; Graf v. Mallon, 8 Cir., 138 F.2d 230, 234, 235; Johnson v. United States, 8 Cir., 126 F.2d 242; Benesch v. Underwood, 6 Cir., 132 F.2d 430, 431; Seele v. United States, 8 Cir., 133 F.2d 1015, 1021; United States v. Messersmith, 7 Cir., 138 F.2d 599; Arbitman v. Woodside, 4 Cir., 258 F. 441.[3] There seems, however, considerable tendency to state a more limited rule than this, such as that examination is only to determine whether there is any evidence at all to support the findings of the local boards, Checinski v. United States, 6 Cir., 129 F.2d 461, 462; United States v. Buttecali, D.C.S.D.Tex., 46 F. Supp. 39, 44, affirmed Buttecali v. United States, 5 Cir., 130 F.2d 172; United States v. Pace, D.C.S.D.Tex., 46 F.Supp. 316, or even more strictly whether the boards have considered all the evidence presented to them, without regard to what their conclusions may be. Ex parte Stanziale, 3 Cir., 138 F.2d 312, 313-315, certiorari denied Stanziale v. Paullin, 320 U.S. 797, 64 S.Ct. 267; Crutchfield v. United States, 9 Cir., 142 F.2d 170, 173, 174; Note, Judicial Review of Selective Service Board Classifications by Habeas Corpus, 10 Geo.Wash.L. Rev. 827, 837, 838; cf. Angelus v. Sullivan, supra, 246 F. at pages 62, 63; 30 Geo.L.J. 636; 32 Geo.L.J. 385; 36 Ill.L.Rev. 310, 352; 38 Ill.L.Rev. 332; 14 Miss.L.J. 445, 465-476.

These different formulas represent at most only slight differences of degree of restriction of judicial review; indeed, it may be concluded that the exact formula is not of the greatest importance, since under all the degree of finality accorded actions of local boards during both wars has been

---

[1] Like the present Act the Selective Draft Act of 1917, 50 U.S.C.A.Appendix, § 204, provided that the decisions of district boards should be "final" except for the appeal to be provided by presidential regulation.

[2] See also United States ex rel. Koopowitz v. Finley, D.C.S.D.N.Y., 245 F. 871; Ex parte Graber, D.C.N.D.Ala., 247 F. 882; United States ex rel. Pascher v. Kinkead, 3 Cir., 250 F. 692; Franke v. Murray, 8 Cir., 248 F. 865, L.R.A. 1918E, 1015; Brown v. Spelman, D.C. E.D.N.Y., 254 F. 215; Napore v. Rowe, 9 Cir., 256 F. 832; cf. United States v. Grieme, 3 Cir., 128 F.2d 811; Goff v. United States, 4 Cir., 135 F.2d 610, 611; Ex parte Cohen, D.C.E.D.Va., 254 F. 711; Application of Greenberg, D.C.N. J., 39 F.Supp. 13; Shimola v. Local Board No. 42 for Cuyahoga County, D. C.N.D.Ohio, 40 F.Supp. 808; Ex parte Beck, D.C.Mont., 245 F. 967.

[3] See also United States ex rel. Errichetti v. Baird, D.C.E.D.N.Y., 39 F. Supp. 388; United States ex rel. Broker v. Baird, D.C.E.D.N.Y., 39 F.Supp. 392; United States ex rel. Pasciuto v. Baird, D.C.E.D.N.Y., 39 F.Supp. 411; United States v. Newman, D.C.E.D.Ill., 44 F. Supp. 817; Ex parte Stewart, D.C.S.D. Cal., 47 F.Supp. 415; cf. Chase, C. J,. dissenting in United States ex rel. Phillips v. Downer, 2 Cir., 135 F.2d 521, 526.

very great.[4] In this circuit, however, we seem practically committed to the test of whether the local board had any evidence before it to sustain its result; indeed, in United States ex rel. Brandon v. Downer, 2 Cir., 139 F.2d 761, 765, we practically said as much in holding that the appeal must have been sustained except for a single incident shown in the evidence, which in fact the board's hearing officer regarded differently than did the board and as to which a majortiy of the court "would have decided otherwise, had we been members of the Board." With this case may be compared United States ex rel. Reel v. Badt, 2 Cir., 141 F.2d 845, where in reversing dismissal of a writ we went so far as to require a local board to show whether it proceeded on its own finding of facts or on its interpretation of law applicable to the findings of its hearing officer; United States ex rel. Phillips v. Downer, 2 Cir., 135 F.2d 521, where we ordered release for misinterpretation of the law; United States ex rel. La Charity v. Commanding Officer, 2 Cir., 142 F.2d 381, where we refused to consider the sufficiency of the evidence; and United States ex rel. Beye v. Downer, 2 Cir., 143 F.2d 125, where we sustained a writ for failure of a local board to follow Selective Service Regulations.

In the absence of an authoritative ruling by the Supreme Court,[5] we are constrained to believe this the rule most consonant with justice and the requirements of the law. The absence of any record of evidence or of any formal or detailed findings (United States ex rel. Reel v. Badt, supra, 141 F.2d at page 848) prevents the application of the ordinary rule of administrative review, while the intent of the statute, not merely in its expressed requirement of finality for board action, but also in its whole plan of decentralized selective service operated through lay and local boards of neighbors and friends of selectees, or of persons knowing neighborhood conditions, suggests that decision is not to be confined to a formal record of testimony taken at a hearing. Ex parte Stanziale, supra, 138 F.2d at page 315. On the other hand, to deny review, whatever may be the facts, so long as the forms of law have been followed, is to constitute arbitrary and unfair action, as was held in Arbitman v. Woodside, supra, which is not consonant with our historic ideas of due process. To hold the findings final if supported by any evidence seems an apt compromise between the conflicting ideals of expeditious functioning of the draft laws and requital of the historic guarantees of due process of law. Support, too, for this view can be drawn from the analogy of the immigration cases, which have long been utilized in construing the selective service laws, see Angelus v. Sullivan, supra, 246 F. at pages 63, 64, and which have consistently applied a similar rule to the review of findings of immigration officials that are made "final" by the statute. See 8 U.S.C.A. § 155(a); Chin Yow v. United States, 208 U.S. 8, 28 S.Ct. 201, 52 L.Ed. 369; Tang Tun v. Edsell, 223 U.S. 673, 32 S.Ct. 359, 56 L.Ed. 606; Nishimura Ekiu v. United States, 142 U.S. 651, 12 S.Ct. 336, 35 L.Ed. 1146; United States v. Ju Toy, 198 U.S. 253, 25 S.Ct. 644, 49 L.Ed. 1040; Tisi v. Tod, 264 U.S. 131, 44 S.Ct. 260, 68 L.Ed. 590; United States ex rel. Vajtauer v. Commissioner of Immigration, 273 U.S. 103, 47 S.Ct. 302, 71 L.Ed. 560; Bridges v. Wixon, 9 Cir., 144 F.2d 927, and cases cited therein. Persuasive also is a similar construction of

---

[4] There seem to have been only three cases under the Act of 1917 where release of selectees from the Army was ordered by the courts, Arbitman v. Woodside, Ex parte Cohen, and Ex parte Beck, supra. See 10 Geo.Wash.L.Rev. 827, supra, and Ex parte Stanziale, supra, 138 F.2d at page 314. The latter case, which reverses D.C., 49 F. Supp. 961, points out the few cases under the present act where release has been ordered. In United States ex rel. Phillips v. Downer, supra, release was ordered for misinterpretation of the statute; in United States ex rel. Reel v. Badt, 2 Cir., 141 F.2d 845, and United States ex rel. De Graw v. Toon, D.C. E.D.N.Y., 52 F.Supp. 170, further proceedings only were required, which also is the substantial effect of United States ex rel. Beye v. Downer, 2 Cir., 143 F.2d 125, and United States ex rel. Bayly v. Reckord, D.C.Md., 51 F.Supp. 507, while Application of Greenberg, supra, appears to be a reversal of a board classification. Relator's counsel herein refers also to a recent unreported case in the District Court for the District of Rhode Island said to be similar to the case at bar.

[5] The cases of Bowles v. United States, 319 U.S. 33, 63 S.Ct. 912, 87 L.Ed. 1194, and Falbo v. United States, 320 U.S. 549, 64 S.Ct. 346, did not pass upon the issue; cf. Mr. Justice Douglas concurring in Hirabayashi v. United States, 320 U.S. 81, 108, 63 S.Ct. 1375, 87 L.Ed. 1774.

the War Risk Insurance Act, which grants power to the Director to "decide all questions arising under this Act." Silberschein v. United States, 266 U.S. 221, 45 S.Ct. 69, 70, 69 L.Ed. 256.

Considering the present record in this light, there was ample justification for the board's action in holding relator not a "regular" rabbi within the meaning of the statute. Relator never pressed this claim very strongly; and what testimony and proof he did offer concerning the regular rabbinical functions he performed was fairly well discredited upon cross-examination. Further, most of his interest seems to have been in the law, not the rabbinate. While the two positions are not mutually exclusive, and a validly draft-exempt minister of religion could still maintain a legal practice on the side, the existence of the latter can be taken into consideration in determining whether registrant is in fact a regularly practicing minister. Buttecali v. United States, 5 Cir., 130 F.2d 172; Bronemann v. United States, 8 Cir., 138 F.2d 333, 337; United States v. Messersmith, supra; Ex parte Stewart, D.C.S.D.Cal., 47 F.Supp. 415, 420; In re Rogers, D.C.N.D.Tex., 47 F. Supp. 265; Goodwin v. Rowe, D.C.N.D.W. Va., 49 F.Supp. 703.

A more difficult question is whether appellant was "duly ordained." The three certificates of ordination, the testimonials from two rabbinical societies, and the testimony of the several accredited rabbis do tell strongly in his favor. But we cannot say that the boards were unjustified in disbelieving this otherwise convincing array of proof. Relator does not make out a very savory case; his story about the date of his ordination shifted with virtually each occasion that he was called upon to give it; and whenever his chances of exemption began to look a little dark, he seemed able to produce a new certificate of ordination that he "had forgotten all about." His father was obviously a rabbi of excellent repute among his fellow rabbis; and his son would naturally be given the most favorable consideration the circumstances would permit, notwithstanding his ignorance of general rabbinical lore. The board could, therefore, consider the rabbinical testimony in relator's favor somewhat colored by interest, without a full picture of the entire situation, despite the high character of the gentlemen involved. There was also a disputed question as to whether any of relator's certificates of ordination were in the usual form, since they did not contain certain Hebrew words—"Yoreh Yoreh" or "Yodin Yodin"; certain rabbis asserted that these words were essential, while others maintained that the certificates were individual to the ordaining rabbi and need not follow any prescribed formula.

In any event, however, Selective Service Regulation 622.44(c) requires that a "duly ordained" rabbi must also customarily perform rabbinical duties. If this regulation constitutes a valid interpretation of the original statute, the matter of relator's formal ordination is of no import, since we have already seen that the finding that he did not customarily act as a rabbi was well supported in the evidence. And we do think the regulation is a reasonable expression of the congressional intent. Unlike the exemption for conscientious objectors of § 5(g) of the Act, which was granted to meet the personal convictions of certain of the registrants, see United States ex rel. Phillips v. Downer, supra, and which is only from combatant service, the absolute exemption of "regular or duly ordained ministers of religion" contained in § 5(d) seems more a recognition of the public need for spiritual guidance than a mere individual privilege. Thus, ministers of religion are relieved of the duty of service not so much for their personal religious training and beliefs, but for the disruption of public worship and religious solace to the people at large which would be caused by their induction. Hence if a registrant is a minister of religion by ordination only as a mere incident of his past history, and not by actual practice, he does not fall within the intent of the exemption. The regulation was followed in In re Rogers, supra; and cf. also Ex parte Stewart, supra.

Relator finally urges that the evidence received by the advisory panel concerning his intellectual qualifications as a rabbi was improperly considered by the selective service boards, which thus were guilty of an error of law similar to that for which we ordered the release of the relator in United States ex rel. Phillips v. Downer, supra. Admittedly the only power of the boards under the statute is to pass on the question of whether a registrant is in fact a "regular or duly ordained" minister of religion. If he is, his qualifications so to act are immaterial. But where, as here, the

registrant's initial status as a minister is in question, evidence concerning his qualifications is quite admissible on the issue of the good faith and truth of the original claim of exemption.

Order affirmed.