**UNITED STATES ex rel. LEVY v. CAIN, Colonel.**

**No. 163.**

Circuit Court of Appeals, Second Circuit.

April 30, 1945.

Meyer Kreeger, of New York City, for appellant.

Vine H. Smith, of Brooklyn, N. Y., for appellee.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

This is an appeal from an order quashing a writ of habeas corpus, and remanding the relator to the custody of the military authorities after induction into the Army. The question is whether the action of the Local Board and the Appeal Board deprived him of any of the rights accorded to him by the statute and the regulations. The facts were as follows. The relator became eighteen years of age on November 29, 1943, on which day he registered with Local Board

No. 190, in Brooklyn. That Board sent him a questionnaire on December 1st, which he returned on December 10th, properly filled out; and. in which he claimed exemption from all service as a theological student preparing for the profession of rabbi, at the Mesifta Talmudical Seminary in Brooklyn, a "recognized" school of theology. Title 50 U.S.C.A.Appendix, § 305(d). The questionnaire he accompanied by a certificate from the registrar of the Seminary, declaring that he was a full time student, admitted on November 7, 1941, and that he would be ordained as a rabbi at the end of his course. On December 13th the Board classified him in Class I-A, because it did not appear at what time his course of study would be completed, or how much time he was then spending in theological studies every day. On the 17th, they asked the registrar to call at their office and bring the records of the relator and another registrant, who was also a student at the Seminary; and that official did appear on the 23rd, and was examined. He said that the two students were engaged in theological work from nine until five-thirty every day; that none of the teaching was secular; that the relator had entered upon "complete religious studies" for at least two years before; and that it ordinarily took ten years before a student received a "Rabbinical degree." Further, that, if at the end of a year a student in the seminary did "not show a promising future," and was not likely to "develop into a good Rabbi, he is advised to leave." At the end of this examination the chairman of the Board declared that the Board were not convinced that either student was studying primarily to become a rabbi; and asked the witness to submit a record of their studies, which he did on the 30th of December. This record showed that the relator had been admitted on November 7, 1941, had completed two years of study and was in his third year; and that all his studies were directly connected with training for the rabbinate. On the 7th of January, 1944, the Board sent the file to the Selective Service Headquarters in New York with a letter saying that there was "a paucity of information" as to how long it would take to complete the course of study; and how many hours the relator actually spent every day at the institution. They further said that the letter of December 30th indicated that the Seminary enrolled high school students or the equivalent, and that during the time a student pursued his high school stud-

ies, he devoted only twenty-eight hours a week to theological courses. They thought "that this premature enrollment of young boys who are mere high school students, in a seminary, is just done to give them a status of Rabbinical students, and for no other purpose"; and they recommended that "an investigation be made of the method of operation at the seminary."

On January 15th the officer in charge of the New York Headquarters requested the relator to appear at the Bar Association of the City of New York on the 19th, "for a special hearing." He appeared on that day before a body described as the "Advisory Panel on Theological Classifications," whose personnel the record nowhere discloses. This "panel" questioned him, and he declared that he expected to be ordained in five or six years; that the course was from nine to ten years; that he had entered the rabbinical division on November 7, 1941; that he had graduated from the secular high school in June 1942, and had been able to enter the higher courses only about a year thereafter; that he had decided to become a rabbi when he first entered the Seminary, having been influenced to do so by a member of the Seminary board. On February 4th, the New York Headquarters returned the file to the Local Board, with a copy of the examination, which they declared had been before the "Advisory Panel on Theological Classifications, composed of distinguished Rabbis and laymen"; and that "the panel voted to recommend that the registrant's status did not warrant his classification in Class IV-D." The letter concluded with an admonition to the Board that "final determination of the registrant's classification must rest with the Board itself, or the appropriate agency." On the 7th, the Board unanimously voted to continue the classification already made on the 13th of December. Thereupon, on the 13th of February, the relator requested a hearing, which was granted him on the 21st. Before that, and on the 15th, the registrar again certified that the relator was a student "in full attendance" and "in good standing," and might "anticipate a fruitful career as a Rabbi." On the 21st, the relator also filed a statement from the dean of the Seminary that he had had above the average rating, had persevered in his studies, had manifested the "highest degree of sincerity and steadfastness in his orthodox principles," and had met "the traditional criteria for an orthodox Rabbi," and at the close of the

current academic year, would have completed five years of his ten year course. On the 21st, the relator appeared and testified, but added nothing of any consequence to what was already before the Board. A member of the Board at that time told him that he had been "heard by a group of the most prominent men of the Jewish faith in the great City of New York. It was their decision, and they [1] are bound by it, that you belong in the U. S. Army." At that time the relator's uncle, a lawyer, attended with him, and asked "upon what basis" the "panel" of rabbis had made the recommendation to the Board. The chairman answered that they did not know the basis of the determination; but that they were not wholly guided by the suggestion of the "panel"; on the contrary, the Board had already been of opinion, even before the matter was submitted to the "panel" "that this registrant properly belonged in Class I–A."

The Board thereupon again continued the classification, and relator appealed to the Board of Appeals on March 3rd. On the 13th the registrar and the relator submitted to that Board statements, in large measure a repetition of what had gone before, except the concluding passage of the relator's own letter, quoted in the margin,[2] in which he complained of unfairness of the "panel." On the 17th day of April, the Appeal Board classified the relator I–A by unanimous vote; and on the 28th of April, the relator petitioned the City Director to order the case reopened or to appeal to the President, supporting this application by a letter from the dean, detailing his theological studies. On May 9th, this application was in its turn refused; and the record closed with a letter from the City Director in New York to the Local Board, stating its reasons for refusing to disturb the findings. The writ issued on May 19, 1944, and the hearing took

place on the 26th. The respondent conceded that the Mesifta Talmudical Seminary had been put upon a list of "recognized" schools by the Director, in accordance with a memorandum which we shall mention in a moment; although it also appeared that the attendance at the Seminary had much increased since the war. Nothing else of any importance was added to the record of the proceedings before the boards. The judge found that the Board had conscientiously observed all the prescribed procedure, and that there his duty ended.

Although the Board rejected the relator's claim of exemption three days after they had received his questionnaire, it is plain from their letter to the registrar on December 17, 1943, that they did not regard that action as final. They wished to learn what had been the scholastic records of the relator and his fellow student, and what were the hours of their attendance. Apparently at that time they were principally concerned with these students' motives in attending the school, as appears from what the chairman said on December 23, 1943, at the end of the registrar's examination. After they received the records in the registrar's letter of December 30, that concern seems to have changed; or, if it did not change, at least there was added a doubt as to the character of the Seminary itself. As we have seen, the Board's letter of January 7, 1944, stated that they felt "that this premature enrollment of young boys, who are mere high school students in a seminary, is just done to give them the status of Rabbinical students, and for no other purpose"; and it was on this score that they urged the New York Headquarters "that an investigation be made of the method of operation at the seminary." Such an investigation presumably preceded the recommendation of the "Advisory Panel" that the relator's "status

---

[1] The word "they" in its context clearly meant the Board. Moreover, so the relator's uncle swore at the hearing on the writ, and his testimony was not contradicted.

[2] "There are only two pages of testimony, very short indeed to go into the background and qualifications of a student to determine his fitness for the Rabbinate. This examination does not go into detail as to my background, qualifications, and bona fide intentions, nor has the Panel filed a report as to its findings, stating the reasons that have caused them to come to this conclusion.

"It is about time this Board realized that where a Panel has passed upon fifty students from one seminary all of whom are bona fide students and out of that fifty have recommended a 4-D classification to only one it cannot be said that each case has been examined upon its own merits and a just, fair, and impartial decision rendered.

"Merely because Jewry is divided into three separate and distinct classes, Orthodox, Conservative, and Reformed is no reason why the Conservative and Reformed Jewry should be preferred over the Orthodox Jewry, and students of these Seminaries be preferred to students of the Orthodox seminaries."

did not warrant his classification in Class IV-D." That might have been based upon either one of two grounds: the "panel" might have thought that the relator was not in good faith studying to be a rabbi, but that the Seminary was one which had been "recognized," and continued to hold its original status; or that the relator was a bona fide student, but that the Seminary was not a proper one. The examination of the relator before the "panel" is consonant with either inquiry. Although there is no evidence as to how far the "panel's" report influenced the Board's reclassification of the relator in Class I-A, we do know that it had something to do with the result, because of the chairman's answer to the relator's uncle that they "were not wholly guided by the suggestion of the panel board." Basch went further, as has appeared, and even said that they regarded themselves as "bound" by the decision.

There is nothing in the record which impeaches the relator's claim to exemption; for, although it is true that at the hearing upon the writ it appeared that since the war the Seminary had had a suspicious increase in its membership, that fact was not before the Board, and we cannot consider it in deciding whether there was "substantial" evidence to support the denial of the exemption. Nevertheless, in spite of the absence of any such evidence, we might hesitate to reverse the Board's finding, for a registrant's appearance may be enough to justify distrust in the good faith of his professions; especially upon that issue, comportment and general appearance are often the best index of sincerity. However, although we cannot know whether the relator may have failed to impress the Board as personally reliable and honest, we cannot accept the result because of the use which the Board made of the "panel." It is true that in United States ex rel. Trainin v. Cain, 2 Cir., 144 F.2d 944, we affirmed an order dismissing a similar writ, where the local board had made use of a "panel" of "five eminent Hebrew professional men"; and where the objection was also pressed. We hold that even though that practise be proper, it must be limited by two conditions, neither of which were here fulfilled: the personnel of the "panel" must be disclosed to the registrant so that he may effectively challenge it; and the answers must be limited to ecclesiastical questions. Such "panels" are properly helpful to local boards only upon subjects as to which the boards need specialized information; they must not be made a substitute for the boards themselves. Despite any categorical form in which their opinions are received, they have only the function of expert witnesses, who like them give their opinions. It seems to us fundamental to any fair trial that, like all other witnesses, their identity must be disclosed to the person whose liberty their testimony is to affect. Unless he knows who they are, it is impossible for him to show what biases or predilections may move them, or whether they have that acquaintance with the subject which alone makes their testimony competent at all. Furthermore, their anonymity relieves them of the important sanction of publicity which guarantees their impartiality and solicitude, just as publicity guarantees the impartiality and solicitude of the tribunal itself. Nor is there any conceivable excuse for concealment that we can see, unless it be to shield the "panel" from a criticism, which, if they are to be fit for their task at all, they should be sturdy enough to withstand.

Moreover, even though the personnel of the "panel" in the case at bar had been known to the relator, and the members had been subject to impeachment and contradiction, the form of their "recommendation" would still have made it improper for the Board to act upon it. All that we have is the report of the New York Headquarters that: "After reviewing the file and examining the registrant, and upon consideration of all the circumstances, the panel voted to recommend that registrant's status did not warrant his classification in Class IV-D." That was not a finding upon an incidental question, as to which the Board lacked an adequate background of acquaintance, and needed help; it was a decision upon the very issue to be decided. The distinction is by no means formal. The relator's exemption, which the "panel" "recommended" the Board to deny, depended upon several possibly mediative or constitutive facts: e. g. the standing and character of the Seminary: whether it was abusing its standing by allowing itself to be used by registrants to evade the draft: whether the relator's studies were of a kind that an honest student would pursue: whether he honestly intended to become a rabbi. There may have been others. Upon some of these facts the Board did indeed need help, and we are assuming that it could put questions to a properly constituted "panel" collectively and did

not have to examine them individually as witnesses. But we can find no warrant for asking a "panel" whether on all the facts it thought the registrant trustworthy; or whether the Seminary was making use of a curriculum, however fair and adequate on its face, in order to evade the draft. Yet it is impossible to know to what extent, if any, the general verdict of the "panel"—as we may call it—comprised, and depended upon, answers to just such questions; and in so far as its "recommendation" in fact did depend upon such answers, the Board could make no use of it without abdicating their statutory duties, and devolving their responsibility. That was no technical irregularity of procedure; it went to the very heart of the controversy and vitiated the whole proceeding. Induction in the Army must indeed be by summary procedure; but we have a number of times decided that, when it appears that a local board has denied to registrants the protection which the statute and the regulations afford them we must intervene. United States v. Kauten, 2 Cir., 133 F.2d 703; United States ex rel. Phillips v. Downer, 2 Cir., 135 F.2d 521; United States ex rel. Reel v. Badt, 2 Cir., 141 F.2d 845; United States ex rel. Bcye v. Downer, 2 Cir., 143 F.2d 125. The same assumption underlies our decisions in United States ex rel. Brandon v. Downer, 2 Cir., 139 F.2d 761; United States ex rel. La-Charity v. Commanding Officer, 2 Cir., 142 F.2d 381; and United States ex rel. Train-in v. Cain, supra (2 Cir., 144 F.2d 944).

Order reversed; relator released from custody, without prejudice to further proceedings of the Local Board in conformity with the foregoing opinion.