**UNITED STATES ex rel. GOODSTEIN v. MALLON, Commanding General, Ft. George G. Meade, Md.**

No. 2556.

District Court, D. Maryland.

July 18, 1945.

R. Palmer Ingram and Carroll F. Fitzsimmons, both of Baltimore, Md., for complainant.

Bernard J. Flynn, U. S. Atty., of Baltimore, Md., for respondent.

CHESNUT, District Judge.

In this habeas corpus case the relator, William B. Goodstein, seeks release from military service in the Army of the United States. Having been inducted into the Army on December 12, 1944, in consequence of an order of Selective Service Board No. 7 of New York City, he is presently stationed at Ft. Meade, within the District of Maryland. His petition for the writ was filed in this court on April 28, 1945.

The ground for the petitioner's release as stated in the petition is that at the time of the order for his induction by the Selective Service Board he was a theological student preparing for the Rabbinate in a duly recognized Rabbinical Seminary (Mesifta Talmudical Seminary). The Selective Service Act, § 305(d) of title 50 U.S. C.A. Appendix provides:

"Regular or duly ordained ministers of religion, students who are preparing for the ministry in theological or divinity schools recognized as such more than one year prior to the date of the enactment of this Act, shall be exempt from training and service (but not from registration) under this Act."

The petition further alleges that the action of the Local Board in classifying the

petitioner in Class 1–A and ordering his induction into the Army was contrary to the uncontradicted evidence submitted by the petitioner to the Local Board and was therefore an arbitrary, capricious and illegal act by the Board.

When the petition was filed in this court a show cause order was at once passed by the Court directed to the respondent returnable on May 2, 1945. The respondent, Major General Mallon, then Commanding General at Ft. Meade, Maryland, promptly filed a brief answer and on May 3, 1945, a supplemental return which reviewed at great length and in detail the procedure before the local New York Board which finally resulted in the induction order. On May 18, 1945, a hearing was had in the case, and after the introduction of much oral testimony the case was postponed for further hearing in order to give the respondent an opportunity to produce further evidence, particularly the testimony of the Local New York Board either by deposition or personal appearance in court. This postponed hearing was held on June 14, 1945, and very extended testimony of Col. Craig, Chairman of the Local Board, was heard in court.

From the evidence in the case I make the following findings of fact:

1. The relator was born in New York City June 12, 1926, and became 18 years of age and therefore subject to the Selective Service law on June 12, 1944. He filed his selective service questionnaire with Local Board No. 7 on July 5, 1944, and therein claimed exemption from military service on the ground that he was "a student preparing for the ministry in a theological or divinity school and attending the Mesifta Talmudical Seminary." He was later found to be physically fit for military service and it is not contended that the order of the Board for his induction was erroneous in any respect other than on account of the exemption claimed. On July 18, 1944, the Local Board sent the relator's file to the New York Director, and Goodstein was notified to appear before a so-called "theological panel" on July 26, 1944 for examination.

2. On August 16, 1944 the Local Board received a letter from the New York City Headquarters stating that the relator had been afforded a hearing by the theological panel on theological classification, enclosing a typewritten statement from the panel reporting its advice and conclusion as a result of the examination of Goodstein, accompanied by a stenographic transcript of his examination. The text of the report was the following:

"Registrant's claim for exemption is predicated upon his status as a student of the Mesifta Talmudical Seminary. That institution is one of several talmudical academies in this area offering courses based upon intensive study of the talmudical tractates, commentaries and codes. While these courses embrace the subject matter upon which candidates for traditional rabbinic certification are examined, students taking such courses are not necessarily preparing for the ministry.

"Orthodox tradition has always encouraged advanced study of talmudic literature, both privately and at academies instituted for that purpose, irrespective of the specific occupational objectives of those engaged in such study, and all courses offered by these academies are open to qualified students without regard to the individual student's specific intention to prepare for a career in the service of the rabbinate.

"Thus, a student ultimately intending to enter business or a profession, or some non-rabbinic activity in the field of religion, may be enrolled in the same courses attended by other students who are specifically concerned with preparation for the rabbinate. It is, therefore, essential for purposes of Selective Service classification to determine in each individual case the purpose which the registrant has in mind in pursuing his course of study.

"Moreover, the fact that the religious tradition in question does not attempt to distinguish between the serious student of talmudic literature and the student preparing for a professional career in the rabbinate, tends to make it extremely difficult for school officials, ministers, and others identified with that tradition, to have and express an objective judgment in such matters.

"To the extent that the distinction is understood, there is a tendency to accept at face value assertions made by the registrant and members of his family and to resolve any doubt in his favor, where it is at least apparent that he is a serious and pious talmudic student.

"Accordingly, this panel is of the opinion that the proper evaluation of the registrant's status must take into consideration the character of the institution he is attending and the relevant circumstances

presented on the record and disclosed at the examination before this panel. Furthermore, in seeking to assess the sincerity of the registrant's declared purpose, due weight must be given to the registrant's manner of answering questions, his demeanor, and, in general, the total impression accruing relative to registrant's candor, trustworthiness and integrity.

"Upon all the information presented and our examination of the registrant, the panel is convinced that registrant is not preparing in good faith for a carrer of service in the practicing rabbinate. The panel is also convinced that he does not aspire to enter the rabbinate as a matter of spiritual conviction and that his professed aspirations in this regard are prompted by the desire to secure a basis for exemption from training and service in the Armed Forces."

3. Goodstein was classified in Class 1-A by the Local Board August 16, 1944. On August 21, 1944, he requested a hearing on this classification. He was permitted to examine the file in his case, including the report of the panel and the stenographic transcript of his hearing before the panel. He made some objections to the accuracy of the stenographic transcript in certain minor respects which, however, I find were immaterial. From time to time thereafter Goodstein submitted numerous other papers to the Board protesting against his classification in 1-A, including some 19 letters from persons purporting to be acquainted with him and certifying generally to their information and belief that he was in good faith studying for the Rabbinate. He stated also that he was assisted in preparation of his several protests by the Registrar of Mesifta Talmudical Seminary and also by the lawyer for the school. Subsequent to the receipt of the report from the theological panel and in response to several protests and requests from Goodstein, he was given three separate hearings (August 30, September 13 and October 4, 1944) with regard to his proper classification. On one or more of these occasions the Local Board reviewed at least in part with him specifically the answers to his questions as stenographically reported in his examination by the panel. Col. Craig, Chairman of the Board, testified without successful contradiction or impeachment of his testimony, that the Board carefully and independently considered Goodstein's case and unanimously reached the conclusion as a result of the several hearings accorded him, that he was not in good faith actually preparing for the ministry. Col. Craig stated that this conclusion was reached by the Board as a result of Goodstein's answers to questions, by his appearance and manner in answering them, and as a result of all the proceedings and hearings before the Board including but not based exclusively on the report of the theological panel. Particularly it was his testimony that the conclusion as to the ultimate fact as to the good faith of the relator was reached independently by the Board and not merely by an adoption by the Board of the panel's conclusion. The Board adhered to the classification of Goodstein as 1-A.

4. Goodstein then noted an appeal to the Local Selective Service Board and conferred with the Government's appeal agent with respect to his case. The appeal agent filed a statement of his interview with Goodstein on October 16, 1944. This is set out in full in the supplemental return in this case by the respondent. After a careful review of the procedure in the case, the statement of the appeal agent continued:

"The Local Board took additional testimony and evidence into consideration which was not before the Panel. The Local Board has had occasion frequently to deal with claims for exemptions by students of the rabbinical school of which Rabbi Quinn is the Registrar and apparently in active control and Rabbi Quinn has frequently been before the officials of the Board in connection with claims for deferred classification. Following the three hearings referred to and the presentation of additional documentary evidence, the Board, on October 4, 1944, continued the Class 1-A classification and indicated agreement with the conclusion of the Advisory Panel.

"We accordingly have a situation of a registrant proving his attendance at a recognized school of divinity, not all the students of which enter the Rabbinate; we have a substantial number, nineteen (19) certificates and written statements, of various kinds testifying to the declared intention of the registrant to become a Rabbi; we have the undisputed fact that at least four years additional study will be necessary before the registrant attains his goal. And, as against this, we have the expressed unanimous belief of the Advisory Panel, specially created and presumably disinterested, declaring that it has taken into consideration the character of the school, and

674

the registrant's manner of testifying and his demeanor and that the Advisory Panel then declared its disbelief in the sincerity professed by the registrant. Subsequently after three hearings the Local Board, also familiar with the head of the school, unanimously concurs in the conclusion reached by the Advisory Board."

Goodstein also filed his statement for consideration of the appeal board.

5. The Local Appeal Board unanimously confirmed petitioner's classification as 1-A. Subsequently on one or more occasions before his actual induction the petitioner requested Local Board No. 7 to reopen and reconsider his case which the Board declined to do. On December 8, 1944 the relator addressed a letter to the New York Director of Selective Service alleging bias and prejudice on the part of the Advisory Panel in recommending that he be not classified in Class IV-D.

6. Jewry is divided into three separate and distinct classes, orthodox conservative and Reformed. Goodstein is an Orthodox Jew. The report of the theological panel as transmitted to the Local Draft Board by the City Director did not contain the names of the three members of the panel and Goodstein complained at the hearing here that he was prejudiced thereby. The evidence showed that the three members of the panel were Judge Goldstein of the New York Court of General Session; Judge Wm. S. Evans of the New York City Court, and Rabbi Morris Max, vice president of the Rabbinical School of America of Orthodox Jews. While the names of the particular members of the theological panel who examined Goodstein were not given to him before the hearing, he learned during or in the course of the hearing, or shortly thereafter, who they were. I do not find that he was in any way prejudiced by not knowing their names at the time.

7. I find that Mesifta Talmudical Seminary is a duly recognized and qualified school in which rabbinical courses are given. Goodstein had attended the lower school of this Seminary for some years prior to his reaching 18 years of age and shortly before his induction he had entered the upper school where many of the students are in fact preparing for the Rabbinate. The enrollment of the school has increased largely in recent years but I find that this, as testified by Rabbi Quinn, vice president of the school, to be due at least in part to normal growth and not only to the existing condition of war. I find also that there was very much affirmative written evidence before the Board to the effect that Goodstein was believed by Rabbi Quinn and many others, in accordance with his pronounced statement, to be in good faith a student preparing for the Rabbinate. I am unable to find, however, that the action of the Local Board in determining to the contrary was not reached in good faith and as the result of the exercise of its independent judgment.

I conclude therefore as a matter of law that the action of the Local Board and of the Appeal Board was not arbitrary or capricious even though on the record in the case this court might have reached a different conclusion as to the proper classification of the petitioner.

Opinion

This case presents very sharply the scope of judicial review of the administrative action under the Selective Service Act. The Act expressly provides, 50 U.S.C.A. Appendix § 310, that the action of the Local Boards in classifying registrants shall be "final", subject to the right of appeal to an Appeal Board and, on certain conditions (not here present) a further appeal to the President of the United States.[1]

No provision for judicial review is contained in the Act; but it is now well established by numerous federal judicial decisions that, after the administrative process has been exhausted and the registrant has been inducted into the Military or Naval Service, he may, in a habeas corpus proceeding, raise the question whether his induction has been in accordance with

[1] The full provision reads:
"§ 310. * * * Such local boards, under rules and regulations prescribed by the President, shall have power within their respective jurisdictions to hear and determine, subject to the right of appeal to the appeal boards herein authorized all questions or claims with respect to inclusion for, or exemption or deferment from, training and service under this Act of all individuals within the jurisdiction of such local boards. The decisions of such local boards shall be final except where an appeal is authorized and is taken in accordance with such rules and regulations as the President may prescribe."

the constitutional requirement of due process.[2] What constitutes due process in this connection has been stated in different phraseology by different courts. The test has been stated to be whether in the administrative process there was "substantial evidence" to justify the order for induction. In the Second Circuit the test is said to be whether there was "any evidence". United States v. Cain, 2 Cir., 144 F.2d 944, certiorari denied Trainin v. Cain, 323 U.S. 795, 65 S.Ct. 439. In still other cases the test is stated to be whether there was a fair hearing and not whether the Board reached a correct conclusion; that is, whether there was procedural due process.[3] In many cases the legal formula used to test the result is whether the administrative action was arbitrary and capricious and so unreasonable as to amount to a denial of a constitutional right. And this is apparently the stated test in this Fourth Circuit.[4]

Counsel for the relator in this case earnestly contends that the induction order was arbitrary, capricious and unreasonable and therefore lacking in due process because the Local Board abdicated its own judgment in adopting the opinion of the theological panel without independent consideration. If this were clearly established by the evidence in the case I think the relator should be released; but as above stated in the findings of fact, I have not been able to reach that conclusion. It is apparently true that the Local Board did attach weight to the report of the Panel in the Board's consideration of the whole case; but I cannot say on the whole evidence that the Board abdicated its own independent judgment in the matter as the

record shows that after the receipt of the Panel report, the relator was given an opportunity to review the report and state his objections thereto, and was given three successive subsequent hearings at which he personally appeared before the Board. He also took an appeal to the Appeal Board and filed for its consideration a written statement of his position and criticism of the Local Board's action. The decision of the Appeal Board, as also of the Local Board, was unanimous against him.

■ It affirmatively appears that it was thoroughly understood that the opinion of the theological panel was advisory only. And it cannot be successfully disputed that the Local Boards under the Selective Service Act have the right to obtain outside advisory information although, when it is a material basis for action, fairness to the registrant would seem to require that he be apprized of its nature and given an opportunity to correct or criticize it. This oportunity was in fact given to the petitioner in this case.

The use of a theological panel seems to be peculiar to the special situation existing in New York City where a very large majority of the registrants in some Local Boards are of the Jewish faith and there have been many applications for exemption from Military and Naval Service by alleged students for the Rabbinate. In many such cases the question has arisen whether the course of studies being pursued by the registrant are such that it should be determined by the Local Boards that the students are in good faith actually preparing for the Rabbinate. In New York there are a number of schools for Jewish people which give courses both in gen-

---

[2] See Billings v. Truesdell, 321 U.S. 542, 64 S.Ct. 737, 88 L.Ed. 917; Falbo v. United States, 320 U.S. 549, 64 S.Ct. 346, 88 L.Ed. 305; Johnson v. United States, 8 Cir., 126 F.2d 242; Smith v. United States, 4 Cir., 148 F.2d 288, 292; United States v. Rinko, 7 Cir., 147 F.2d 1; United States v. Kanten, 2 Cir., 133 F.2d 703; United States v. Downer, 2 Cir., 135 F.2d 521.

[3] Crutchfield v. United States, 9 Cir., 142 F.2d 170; United States v. Grieme, 3 Cir., 128 F.2d 811; Ex parte Stanziale, 3 Cir., 138 F.2d 312, certiorari denied Stanziale v. Paullin, 320 U.S. 797, 64 S.Ct. 267, 88 L.Ed. 481.

[4] In Goff v. United States, 4 Cir., 135 F.2d 610, 612, the court said: "That action is to be taken as final, notwithstanding errors of fact or law, so long as the

board's jurisdiction is not transcended and its action is not so arbitrary and unreasonable as to amount to a denial of a constitutional right." And in the later case of Smith v. United States, 4 Cir., 148 F.2d 288, 292, it was said: "It was certainly for the board to say whether a college student eighteen years of age, majoring in engineering, and claiming to be a minister of religion merely because he distributed Bible literature and conducted Bible studies, was a minister of religion within the meaning of the Selective Service Act. See Smith v. Richart, D.C., 53 F.Supp. 582, 583, 584. The decision of the board was affirmed by the appeal board and by the President; and there was nothing offered to show that in any of the proceedings defendant was denied any constitutional right."

eral Jewish education and also specially for the Rabbinate. It is not easy and may not be possible for the members of the Local Board to determine without expert theological advice whether the course of studies pursued by the registrant fall in one or the other category of religious instruction. To meet this special problem the New York City Headquarters under the Selective Service Act has formed a large panel of theological experts to whom, or some of whom from time to time, particular cases are referred for expert opinion in an advisory way to the Local Board. This form of aid to the Local Boards has been approved in a number of judicial decisions in New York and elsewhere.[5] But in the latest decision in the Second Circuit involving the subject, the scope of the use by the Local Board of the report of a theological panel was limited to two conditions—"the personnel of the 'panel' must be disclosed to the registrant so that he may effectively challenge it; and the answers must be limited to ecclesiastical questions." Speaking for the court Circuit Judge Learned Hand said (United States ex rel. Levy v. Cain, 2 Cir., 149 F.2d 338, 341):

"Such 'panels' are properly helpful to local boards only upon subjects as to which the boards need specialized information; they must not be made a substitute for the boards themselves. Despite any categorical form in which their opinions are received, they have only the function of expert witnesses, who, like them, give their opinions."

In the present case counsel for the relator relies strongly upon this latest Circuit Court decision. It is true that in some respects the facts of that case are very similar to those in the instant case; and by reason of the high regard that I have for the opinions of that court, and its special familiarity with the local conditions in New York City where the practice regarding these theological panels prevails, I have considered the case very carefully for its bearing on the case here. The result of that case was that the relator was released from custody "without prejudice to further proceedings of the Local Board in conformity with the foregoing opinion". But there are important differences in the facts of the two cases. In the Levy case the release of the relator was principally grounded on the use which the Local Board made of the Panel's report. It was said "we cannot accept the result because of the use which the Board made of the 'panel.'" As I read the opinion the court based its criticism of the Panel report in the Levy case on three grounds: (1) that the members of the Panel were anonymous and the registrant therefore did not have the opportunity to show to the Local Board possible objections based upon their personal bias or prejudice against him; (2) the adverse report of the Panel did not specify on what ground it was based and (3) apparently the Local Board's action was too largely based on the Panel report. The opinion also noted the absence of any evidence in the record to impeach the relator's claim to exemption. Commenting thereon, it was said:

"Nevertheless, in spite of the absence of any such evidence, we might hesitate to reverse the Board's finding, for a registrant's appearance may be enough to justify distrust in the good faith of his professions; especially upon that issue, comportment and general appearance are often the best index of sincerity."

These objections to the use of the Panel report in the Levy case do not apply in the instant case. Although the Panel report was not signed by its members when transmitted to the Local Board, the registrant ascertained the personnel of the Panel and did have the opportunity to attack the report on the ground of bias of its members. Again the Panel report in this case did distinctly state the grounds on which the conclusion of the Panel was based. It is true the conclusion (by the nature of the case) resulted from a blend of both factual impressions and ecclesiastical knowledge; but the advisory report frankly so stated, and in transmitting it the New York Headquarters particularly cautioned that the ultimate decision, largely factual as to the registrant's sincerity, must be made independently by the local board; and the testimony of the Chairman of the Board in this case is to the effect that the Board did make its own decision based on its opinion as to the sin-

---

[5] United States v. Cain, D.C.N.Y., 57 F.Supp. 715; United States v. Graham, D.C.Ark., 57 F.Supp. 938; United States ex rel. Trainin v. Cain, 2 Cir., 144 F.2d 944; Cf. United States v. Magruder, D. C.R.I., 55 F.Supp. 947. In Cramer v. France, 9 Cir., 148 F.2d 801, the court apparently approved the use of the expert opinion of an Agricultural Board with respect to an agricultural exemption claimed by a registrant.

cerity and good faith of the registrant from its observations of his comportment and general appearance at his several hearings before the Board. It is true that there was some evidence in this case tending to the contrary given by the relator and by Rabbi Quinn, vice-principal of the Theological Seminary; but I do not think it was sufficient to overcome the presumption of official regularity and fairness appearing from the registrant's cover file showing the hearings accorded him by the Local Board and the affirmative testimony of the Chairman of the Board.

In the Levy case the court in effect remanded the case to the Local Board because under the particular circumstances the Panel report constituted wholly inadmissible evidence which should not have been considered at all by the Board. But the circumstances here are so different both as to the character of the report itself, and the subsequent treatment of the registrant's case, that I do not think the case requires or permits similar judicial action.

Counsel for the relator vigorously contends that both the theological panel and the Local Board were biased and prejudiced against him. The basis for this contention is the relator's own testimony to the effect that at each of the hearings his objections were summarily overruled and he testified as to certain casual remarks made by one or more members of the Board tending to that effect; and there was also some evidence by Rabbi Quinn that in a number of cases this and other local boards in New York City had rejected some claims for exemption from other students at his Seminary. But this evidence is not weighty or convincing that there was any personal prejudice by any of the members of the theological panel or of the Local Board against the relator personally. The further contention is however made that in the absence of such personal prejudice both the theological panel and the Local Board were prejudiced against the relator as one of a class. This was more specifically stated in a letter dated December 8, 1944 from the registrant to Col. McDermott of the New York City Headquarters, set out in the margin.[6] However, this contention is not supported by convincing factual evidence. It was largely a matter of personal opinion or inference of the relator and Rabbi Quinn. And there is certainly no evidence of any kind in the case that the members of the Appeal Board, who were unanimous in confirming the classification by the Local Board, were in any way prejudiced or biased.

As I have said, this case presents sharply the scope of judicial review. Briefly summarized, the situation is this. The registrant was properly classified in 1–A unless he was in good faith preparing for the Rabbinate. On this issue the Local Board requested the advisory view of a theological panel consisting of two New York State Judges and a prominent Orthodox Jew. They gave the registrant a hearing and concluded for the reasons already stated that he was not in good faith preparing for the Rabbinate. The registrant challenged the report before the Local Board and was given full opportunity in three subsequent hearings to state his objections and to submit affirmative evidence contrary to the advice of the Panel. He did submit a considerable volume of opinion evidence to the contrary. The Board had the opportunity to observe his demeanor and comportment at these hearings and to form its own independent judgment, of which there is evidence that the Board did. The relator took an appeal and in writing stated his case on appeal. The Appeal Board independently affirmed the decision of the Local Board. On the case made here in this court, on the issue of good faith of the relator, the written evidence other than that of the theological panel is uncontradicted in favor of the relator. For him it may also be said that the stenographic report of his examination before the theological panel on which the report of the Panel was based, is not intrinsically of itself convincing to the non-theologi-

[6] "I believe that I am the innocent victim of the difference that exists in the Jewish community at the present time. I believe the panel is prejudiced against a student of my type. * * * Furthermore, the panel is not and has not been interested in finding out whether or not I am a bona fide student. The panel is motivated by extraneous considerations. They are afraid that at some future date, say some ten years from today, if a checkup were made to find out how many of the students at present studying for the rabbinate actually completed their courses and became rabbis, it might be found that a substantial number did not do so and that this might bring discredit upon the name of Jewry. That is their sole motive, as I understand it, and for that reason they disqualify and refuse to recommend as many students as they possibly can."

cal layman that the relator was not personally sincere in his professions. And also his examination on the witness stand at the hearing for more than an hour likewise did not convince me of his bad faith. But also it should be observed that both the Panel and the Local Board were necessarily much more familiar with the whole local conditions in New York than I could be here in Baltimore.

But however that may be, it is clear that this case must be determined by the evidence before the Local Board. It is not a hearing *de novo*. The issue was succinctly stated by the Government Appeal Agent for consideration by the Appeal Board: "The situation is not dissimilar to a jury trial in which a witness gives uncontradicted evidence and yet the judge may charge the jury that it has the right to disbelieve the witness although uncontradicted." The Local Board did disbelieve the witness' professed sincerity. The question of fact was within their province and jurisdiction; and the scope of judicial review here does not permit this court to substitute what might have been its judgment in the case for that of the Local Board affirmed on appeal. As was said by the Circuit Court of Appeals for this Circuit in Smith v. United States, 148 F.2d 288, 292, it was certainly for the Board to say whether the student was preparing for the ministry within the Selective Service Act.

In conclusion I find no constitutional defect in the administrative process in this case. It results that the writ must be dismissed. Counsel may prepare the appropriate order in due course.