## UNITED STATES ex rel. PHILLIPS v. DOWNER, Colonel.

### No. 259.

Circuit Court of Appeals, Second Circuit.

May 7, 1943.

Osmond K. Fraenkel, of New York City, for relator-appellant.

Vine H. Smith, Asst. U.S. Atty., of Brooklyn, N. Y. (Harold M. Kennedy, U. S. Atty., and Mario Pittoni, Asst. U. S. Atty., both of Brooklyn, N. Y., on the brief), for respondent-appellee.

Before AUGUSTUS N. HAND, CHASE, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

Randolph Godfrey Phillips, a native-born American citizen aged 32 years, duly registered under the Selective Training and Service Act of 1940, 50 U.S.C.A.Appendix, § 301 et seq., but claimed exemption from combatant service as a conscientious objector under its provisions, 50 U.S.C.A.Appendix, § 305(g). This claim, together with other claims for deferred classification, was disapproved by the local board, and thereafter by the appeal board, after a hearing conducted by the Department of Justice according to the statute cited and upon the report, November 23, 1942, of Honorable Lamar Hardy, Hearing Officer. Further appeal to the President was denied. Phillips was, therefore, inducted into service on March 6, 1943, and was orderd to, and did, proceed to Camp Upton on March 13, 1943. Thereafter his mother, Amy P. Phillips, filed a petition in the district court for a writ of habeas corpus to challenge the legality of his classification by the draft board and his induction into the Army, upon an affidavit made by him which includes by exhibit all the draft proceedings, as well as the full report of the Hearing Officer. Respondent, colonel in charge at Camp Upton, filed a traverse, asserting that he holds the draftee by authority of the United States as a soldier lawfully selected for service and regularly inducted under the provisions of the Act.

Since the draftee has, therefore, obeyed the law by responding to the call for induction and has relied upon the writ of habeas corpus to test his legal rights, questions of procedure such as have arisen in cases of a similar nature are here avoided and he has placed himself in the proper position to challenge the legality of his induction. In the recent case of United States v. Kauten, 2 Cir., 133 F.2d 703, one ground of our affirmance of a criminal conviction under the Act was that failure to report as ordered was in itself an offense, as had been held in several other cases, including United States v. Bowles, 3 Cir., 131 F.2d 818, affirmed by the Supreme Court May 3, 1943, on another ground, 63 S.Ct. 912, 87 L.Ed. —. Since no such issue arises here, we may turn at once

to the substantial question raised by this appeal from the district court's order quashing the writ.

The facts before the draft authorities directly present this question, which is whether the draftee—in the statutory language—"by reason of religious training and belief, is conscientiously opposed to participation in war in any form," and hence is entitled to exemption from combatant training and service. The draftee is a college graduate who has studied music, worked as a newspaper reporter on New York papers, and held some governmental and industrial positions commanding substantial wages. He resigned from his last employment in September, 1941, to devote his entire time to writing. He received his early religious training in the Presbyterian Church, although he stated that he was not now a member of any religious sect or organization. He is opposed to killing men, or assisting directly or indirectly in the killing of men, and refused a commission in the Navy in December, 1941, because of his objection to participating in the war effort in any way. He would not fight even to repel invasion, but believes that "war is ethically and invariably wrong."

He has remembered various teachings of the Christian church, such as the Lord's Prayer, the Ten Commandments, and the Sermon on the Mount, but has also read the works of "many of the philosophers, historians and poets from Plato to Shaw." He says that many of these men have touched his imagination and have provided him with as much religious training as a communicant of a formal church receives. "But from whom I derived my opposition to killing men—which I judge to be the objective of 'combatant military service'—I cannot specifically say. Yet the fact remains that I have this opposition." The report of the Federal Bureau of Investigation which was before the Hearing Officer commented upon his character favorably; and he was described "as a quiet, studious, reserved young man, who does a great deal of serious reading." His references were interviewed, and apparently had no doubt of his sincerity and his long-continued objection to war. In fact the reality of his belief does not seem to be in issue here. Had it been, he states that he was prepared to introduce further evidence, and that his brother, a lieutenant in the Navy now in service overseas, "was particularly anxious to testify that my views had been held by me ever since I was old enough to understand such matters and that my opposition to war rested on basic ethical and humanitarian grounds, essentially religious in character." His further sworn assertion that "my opposition to war is deep-rooted, based not on political considerations but on a general humanitarian concept which is essentially religious in character," appears, therefore, borne out by the record. It should be noted, further, that it is something more fundamental than a mere aesthetic abhorrence of physical combat and bloodshed.

That there is no issue of fact as to the sincerity of the draftee's belief is also shown by the conclusion of the Hearing Officer made after quoting the F. B. I. report and referring to the other matters, including the draftee's testimony, before him. He says: "This Hearing Officer is frank to state that this case is not without its perplexities. The registrant is undoubtedly sincere in his opposition to war, but whether his objections thereto are the result of his philosophical and humanitarian concepts which are deemed to have the essence of religious thought, or whether they more largely result from his political convictions and his dissatisfaction with our present way of life, is not quite clear." He adds: "The latter would seem to be indicated, however"; but he then proceeds to base this conclusion entirely upon a play, "Hungryman's Library," written by the draftee some time prior to our entrance into war. To the analysis of this work—from which he had earlier made several pages of quotation—he devotes the remainder of his report.

In view of the weight given in these proceedings to this play, we shall need to discuss it below. Unless it justifies a different result, it seems clear that the draftee had shown himself a conscientious objector within the statutory meaning as defined in the Kauten case and was entitled to exemption as such, so long at least as the principles there announced stand as the authoritative interpretation of the Act. It is to be noted that the facts differ from those upon which we relied in the Kauten case as an alternative ground for affirmance of the conviction there. For here the opposition to war was a deep-seated one applying to war in general and was not based upon political objections to this particular war. As said in the Kauten case,

524

133 F.2d at page 708: "There is a distinction between a course of reasoning resulting in a conviction that a particular war is inexpedient or disastrous and a conscientious objection to participation in any war under any circumstances. The latter, and not the former, may be the basis of exemption under the Act. The former is usually a political objection, while the latter, we think, may justly be regarded as a response of the individual to an inward mentor, call it conscience or God, that is for many persons at the present time the equivalent of what has always been thought a religious impulse." There we found evidence to sustain the finding that the draftee was of the former view; here it seems clear that the draftee holds the latter view.

■ The Government does make a claim that a registrant's opposition to war must be definitely traceable to some religious belief or training. But if a stricter rule than was announced in the Kauten case is called for, one demanding a belief which cannot be found among the philosophers, but only among religious teachers of recognized organizations, then we are substantially or nearly back to the requirement of the Act of 1917 of membership in a well-recognized religious sect or organization whose existing creed or principles forbid its members to participate in war in any form. Selective Draft Act of 1917, 50 U.S.C.A.Appendix, § 204. Such a provision was in the original bill for the 1940 Act, but was amended to the form referred to above to secure at once greater protection for individual beliefs and less difficulty for the Government in meeting the not easy problem of the conscientious objector. How the bill came to be changed is brought out by the testimony before the House Committee on Military Affairs, which shows that membership in an established church or the following of its beliefs was not intended as a requisite, a view repeated on the floor of Congress. See Hearings before Committee on Military Affairs on H. R. 10132, 76th Cong., 3d Sess., 1, 201–211; 86 Cong.Rec. 10106. Hence we said in the Kauten case, 133 F.2d at page 708: "The provisions of the present statute are more generous for they take into account the characteristics of a skeptical generation and make the existence of a conscientious scruple against war in any form, rather than allegiance to a definite religious group or creed, the basis of exemption." And we found religious belief to arise "from a sense of the inadequacy of reason as a means of relating the individual to his fellow-men and to his universe," a belief "finding expression in a conscience which categorically requires the believer to disregard elementary self-interest and to accept martyrdom in preference to transgressing its tenets."

Hence, unless the draftee's play persuades to a different result, he should have been classified as a conscientious objector. But a careful examination of the play convinces us that, fairly considered, it does not in any way qualify the draftee's views, as above set forth, but, on the contrary, re-enforces them.

Since the draftee offered the play in support of his claim for exemption, it may be considered for whatever it is worth in the premises. But its teachings are not so crystal clear that we should follow the course pursued by the draft officials of wholly rejecting the interpretation which its author, whose sincerity has not been questioned, himself places on it as an expression of his views. He asks us to consider the whole play, and not to identify any one character as a protagonist of his ideas. This would seem reasonable and appropriate. Throughout the play the horror of war and the importance of the position of the conscientious objector are stressed. The play takes place in a library of precious books and paintings given by the capitalist Hungryman for the edification of his fellow men, and it revolves around the seizure of the building and threat of its destruction by Bloodhart, the prototype of Adolf Hitler. The Hearing Officer considered one of the characters, the poet Shepherd, to represent the author; and since in the course of the play Shepherd seizes a revolver and threatens Bloodhart for the safeguarding of the others present, including the heroine, Consuelo, the conclusion was reached that the author himself is not opposed to force under all circumstances. The author, we think with reason, challenges the fairness of identifying him, a mature man of thirty-two with settled convictions, with this immature poet of twenty-three, whose ideas are shown throughout to be far from solidified. Indeed, this incident, which has been so stressed as a demonstration of the author's ultimate reliance on force, appears only an attempt to give dramatic movement to the play; it is represented as leading to feelings of doubt and dismay on the part

525

of the poet, who says: "Good God, what have I done? Can it be that military warfare will only be abolished by a conscientious objector taking arms and forcing his creed down the throat of the killers? What a colossal paradox! Is this the answer?"

Perhaps the author intended here to present the perpetual intellectual dilemma of the conscientious objector, including himself. Certainly, however, it is hard to see in this instinctive action a denial of the views propounded elsewhere throughout the play. Thus, Shepherd has said earlier: "Don't you see, Consuelo, this killing will go on forever unless every man becomes a conscientious objector, unless he is taught to be one from childhood, unless every nation becomes a nation of men refusing to kill for any idea or church or bank or government? How else are we to free ourselves from this eternal round of human slaughter?" And Mannheim, the man of science, perhaps a clearer protagonist of the author's ideas than Shepherd, says this in the last act of the play: "Let us by law make conscientious objection to military killing not the eccentricity of the few but the carefully instilled educational policy of each nation's schools and universities."

Further, if we consider the dramatic action of the play, it is to be noted that Shepherd's rather weak demonstration of force, leading to a question mark, is not the climax of the play or the means by which the library and its then occupants are saved from destruction by Bloodhart. Rather it is the persuasion of Consuelo, who allows Bloodhart to take up his box of T. N. T., by the dropping of which he could "blow us all into the heavens." But because of her influence upon him, he carries it out of the building. The thesis here would seem to be the power of reason in place of force. True, at the very conclusion of the play Bloodhart returns with the box of T. N. T. still under his arm and says: "I cannot make up my mind. Once a man has started a thing he must finish it. What is to become of me if I do not blow myself up with this explosive?" And thus the curtain falls. Whether we are left to conclude that evil finally triumphs with Bloodhart's dropping of his precious bundle or that the good influence of Consuelo has saved all, and notwithstanding a certain incoherence in plot development, it is difficult to find anything in this which counteracts the general abhorrence of physical force and the philosophical belief in conscientious objection, so strongly shown throughout the rest of the play.

The Hearing Officer does refer somewhat to a point here stressed by the Government, namely, that the play contains a criticism of the effects not merely of Fascism abroad, but of finance capitalism in this country, as portrayed by Hungryman himself, with some statements that a division of "the plunder" must be had. But whatever the weight of the intended criticism, it is not linked to any definite political movement, nor is it clearly enough defined to be considered a political conclusion in itself. And even if it were, it appears but a correlative, and not the defining limitation, of the belief against war. We do not think it can properly be resorted to as overthrowing the force of the latter, or that the play as a whole can be considered any substantial evidence to support the draft classification.

■ We conclude, therefore, that the draftee here was erroneously denied the benefits of the exemption he claimed. And we think this is an error of law, for it rests fundamentally on a different distinction between religious and political views than that which we stated in the Kauten case, decided some time after the Hearing Officer had made his report. We made it clear in that case that the courts cannot act as appellate tribunals for the draft machinery, and that the weight of evidence is a matter for the draft boards. Nevertheless it has been considered settled under both the Draft Act of 1917 and the present Act that errors of law are to be rectified by the courts. The various authorities are well collected and analyzed in United States v. Grieme, 3 Cir., 128 F.2d 811. We think, therefore, that the writ should be sustained.

■ When this petition came before the district court, the court required the draftee to take the witness stand, and examined him at length and with considerable heat. The testimony elicited did not change the picture and, in any event, should not be considered; draft boards can hardly function if evidence can be held in reserve for a trial de novo in the courts. At least no greater review can be had than that allowed for administrative agencies generally. We are constrained especially to deplore the proceeding here, as it led to the sacrifice of judicial impartiality and dignity for emotion which, however justifiable

under other circumstances, had no place in the courtroom.

The order denying the petition and quashing the writ of habeas corpus is reversed, and the case is remanded to the district court with directions to sustain the writ as prayed for.

CHASE, Circuit Judge (dissenting).

Because I am unable to agree that the scope of our review is as extensive as the majority opinion has made it, perhaps it may be worthwhile to state why I cannot do so.

It must be remembered that the relator owes generally the same duty to his government under the Selective Service Law that is owed by every other able bodied American of draft age. The sole question is whether he is entitled to stand aloof, freed from that otherwise unshirkable obligation because of his belief. On that score the issue is not alone of his sincerity which I do not question in so far as he is conscientiously opposed to participation in war in any form. It is whether the duly authorized classification agency conscientiously considered the evidence; found all the material facts proved; and lawfully classified him accordingly.

Congress had the duty as the legislature of a civilized nation to provide for separate classification for what are sometimes called conscientious objectors and did so in § 305 (g) of Title 50 U.S.C.A.Appendix. That statute has been invoked in behalf of this relator. It was the duty of the courts to interpret it and this court has already done that in United States v. Kauten, 2 Cir., 133 F.2d 703. But it was the duty of the relator's draft board to determine whether he held in fact the kind of belief which entitled him to special classification under the statute.

On this appeal from the order dismissing the writ of habeas corpus, we ought to determine first whether the record shows that the draft board gave the relator a fair hearing. If it did we can only determine whether it found the facts upon substantial evidence and after due deliberation. If these queries should be answered in the affirmative, its findings become the facts for us and its action should be upheld if it correctly applied the law to the facts as found. On this appeal the decisive issue concerns the fact as to the source of the relator's belief. He needed to prove, to come within the statute, that it was religious within the interpretation of that in the Kauten case. I regard the decision of the draft board adversely to him on that question to be final on the evidence in this record. Not because any positive finding was warranted, but because the failure to find affirmatively the needed basis for his belief was not clearly erroneous.

The very complexity of the inquiry to determine whether an individual thinks as he does because of certain kinds of reasons made it difficult to arrive at a solution in the first instance but with the problem once solved by the draft board in the statutory way that very difficulty makes a proper review correspondingly less difficult; not because the actual fact may be plain for all to see but because the relator is entitled to no more than to have the draft board act fairly and reasonably in finding or failing to find problematical facts as best it can on the evidence before it. Congress might have made the relator's task easier by doing away with all vestige of a tie to religion as the basis of the requisite belief but it clearly did not do that. We have tried to give effect in the Kauten case to the change actually made from the 1917 Act in that respect. Although that case was not decided until after the draft board had made its classification of this relator, we certainly should not assume that it would have made any difference in the inability of the draft board to find that his antipathy to participation in war did not spring from his political views. Reasonable men might well differ upon whether this young man proved that he based his conscientious objection to participation in war upon religious training and experience as defined in the Kauten case. He attempted to bolster his own assertions that he did by introducing his play in evidence. As might be expected, perhaps, it contains passages from which one may argue both ways as to what engendered the relator's mental attitude toward participation in war. Both sides rely on it and under the circumstances it did not compel a decision by the draft board one way or the other. Neither did the assertions of the relator himself. And, as seems abundantly clear, neither did all the evidence combined. If, as I think, the evidence left an essential fact doubtful, whatever classification this relator should be given is the one his draft board arrived at after due consideration of the facts as reported by an able

and impartial hearing officer. When such an administrative agency failed to find on equivocal evidence a disputed and obscure fact which the relator was bound to prove to get a statutory privilege and the appeal board made no change, all but the merely formal of his remedies were exhausted. Sec. 10 (a) (2) of the Act; United States v. Bowles, 3 Cir., 131 F.2d 818.

I would affirm the order.