UNITED STATES of America, Appellee,

v.

Ronald F. LEVY, Appellant.

No. 19507.

United States Court of Appeals Eighth Circuit.

Dec. 8, 1969.

Conditional Sale of Chattels, 87 A.L.R. 1308 (1933) (which has been supplemented in 148 A.L.R. 375 (1944) and 13 A.L. R.2d 1312 (1950)).

Louis Gilden, St. Louis, Mo., for appellant and filed brief.

Daniel R. O'Neill, Asst. U. S. Atty., St. Louis, Mo., for appellee, Daniel Bartlett, Jr., U. S. Atty., on the brief.

Before MATTHES, BLACKMUN and GIBSON, Circuit Judges.

GIBSON, Circuit Judge.

The appellant, Ronald Levy, was indicted, convicted upon a trial to the court and sentenced to five years imprisonment for failing to comply with an order of his Local Selective Service Board to report for and submit to induction in violation of 50 App. U.S.C. § 462.

The principal issue presented on this appeal is whether Levy was improperly denied a I–O classification as a conscientious objector by the Local Selective Service Board and by the Missouri Selective Service Appeals Board. The District Court based its determination

upon the ground that the Local Board and the Appeals Board had a "basis in fact" for their determination that Levy's opposition to war was not based upon "religious training and belief" as required by the Military Selective Service Act of 1967, 50 App. U.S.C. § 451, but rather was based upon "a merely personal moral code."

There is no contention by the Government in this appeal that Levy's views were insincere, not truly held, or inconsistent. Thus, the only question before us is whether Levy's pacifist beliefs meet the statutory requirement for a conscientious objector exemption—that they be based upon religious training and belief. Levy raises several other issues involving alleged violations of procedural due process, but since we find no basis in fact for the determination by the Selective Service System and the District Court that Levy was not entitled to a conscientious objector classification, we need not reach those issues. Nor must we reach the issue discussed in United States v. Sisson, 297 F.Supp. 902 (D.Mass.1969) of whether the present statute violates the Constitution by discriminating against non-religious objectors since we find Levy's beliefs meet the religious tests under the Act as construed by the Supreme Court in United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965).

Levy registered for Selective Service on December 14, 1962. He filed his completed Classification Questionnaire on January 17, 1963. He received a student deferment until May 13, 1964 at which time he was classified I–A by the Local Board. On May 23, 1964 he mailed a letter to the Local Board appealing his classification on the basis of conscientious objection and student status. He filed his completed SSS Form 150 (Special Form for Conscientious Objectors) on July 7, 1964. Thereafter he was classified II–S until November 15, 1967, at which time he was classified I–A. In a letter received by the Local Board on November 24, 1967 Levy requested an appeal of this classification for the purpose of changing it to I–O. The Local Board treated this letter as a request for a personal appearance, which was held on December 20, 1967 in the presence of one Board member. On January 17, 1968 Levy was classified I–A by two Board members. On January 26, 1968 appellant appealed his classification to the State Appeals Board. On April 23, 1968 the Appeals Board also classified Levy I–A. As a result of Levy's failure to submit to induction as ordered by his Local Board, prosecution ensued on which this appeal is based.

In his Classification Questionnaire filed January 17, 1963 Levy did not request a I–O classification. However, after being classified I–A on May 13, 1964, he wrote to the Board on May 23, 1964 seeking a I–O classification. On July 7, 1964 he filed SSS Form 150, stating that he did not believe in a Supreme Being and set out his belief as follows:

"I believe that each person has a conscience to which he owes duties superior to or higher than standards which may have been established by human agencies. I believe that each person must ultimately be responsible to his own conscience or inward mentor. This religious belief finding expression in my conscience requires me to disregard elementary self interest and to accept the consequences in preference to transgressing its tenets.* I believe it is wrong to engage in any act which might bring physical injury or harm to any person and I object to participation in any war under any circumstances.

*"Paul Tillich in *Theology of Culture* (Oxford University Press, New York 1959, pp. 7–8) defines religion: 'Religion in the largest and most basic sense of the word, is ultimate concern. And ultimate concern is manifest in all creative functions of the human spirit.' He further states, 'It is manifest in the moral sphere as the unconditional seriousness of the moral demand'."

Levy next articulated his beliefs at a personal appearance before the draft board on December 20, 1967. There he filed a paper which reads:

"I have recognized that the term 'Supreme Being' does not necessarily imply the classical orthodox view of an omnipotent anthropomorphic God. I can now therefore claim in good conscience that I believe in a Supreme Being. The Supreme Being is the force which makes men subject to moral considerations. It is this force which makes us accountable for our actions. This force is manifested in each individual in the form of conscience. Each individual must do what his conscience prescribes since to ignore the conscience is to deny that he is subject to moral judgment; but all men are clearly subject to moral judgment. An obvious question to ask now is why not all consciences are the same, that is, why the Supreme Being does not manifest himself the same way in all people. The answer to this is that although all men are told by their consciences that they are subject to moral judgment, the conscience does not supply the information with which one must make a moral decision. Thus the conscience is that force in each individual which tells that individual to do the right thing, once that individual has decided what the right thing to do is. The conscience is the part of each individual which corresponds to the Supreme Being in mankind as a whole. To put this another way, the Supreme Being is the conscience of mankind as a whole; it is that force which makes men responsible for what they do."

At trial he testified that under no circumstances were wars right and all moral ends could be accomplished without violence. He also related an incident in which he stood between a friend and several teen-age attackers, accepting their punishment in order to protect his friend, and not fighting back.

Levy further testified he believes in a force greater than people which he thinks he can call God; he has believed this all along but previously had some uncertainty as to whether this force "* * * could be classified as God"; he does not believe Israel should use force to defend itself; his pacifist beliefs stem from the teachings of his parents who are Jewish and who brought him up in the Jewish religion, particularly from the stories of genocide in Germany, and from religious training that killing is wrong, and from conversations with other people.

Two clergymen testified in Levy's behalf, vouching both for his sincerity and for his functional belief in God.

The trial court in its findings of fact and conclusions of law stated that under the "extremely narrow" scope of judicial review of administrative action under the Military Selective Service Act of 1967,

"* * * [Levy] did not establish that he was entitled to an exemption as a conscientious objector. He did not establish that his claim was based upon 'religious training and belief.' * * * The record before the Local Board in this case shows conclusively that the registrant's claim was based on a 'merely personal code.' "

The Court further said Levy would not qualify as a conscientious objector even under United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850 (1965), and that the "decision of the Local Board to classify this defendant I–A has 'basis in fact.' "

The crucial issue in this case turns upon what the present standard is for determining an individual's qualification for a conscientious objector classification. The present statute, The Military Selective Service Act of 1967, 50 U.S.C. App. § 456(j) provides:

"Nothing contained in this title * * * shall be construed to require any person to be subject to combatant training and service in the armed forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. As used

in this subsection, the term 'religious training and belief' does not include essentially political, sociological, or philosophical views, or a merely personal moral code."

In attempting to interpret the breadth and meaning of this statute it is helpful to examine some of its historical antecedents.

In 1917, in order to deal with the conscientious objector problem that arose from a forced conscription for World War I, the first such conscription after the Civil War, Congress passed a law granting exemption to members of "any well recognized religious sect * * * whose * * * principles forbid its members to participate in war in any form." 40 Stat. 78 (1917). Difficulties in determining which sects qualified led to an executive order from President Wilson granting conscientious objector status to draftees conscientiously opposed to combatant service on religious or other grounds. Exec. Order No. 2823 (March 20, 1918).

The Selective Training and Service Act of 1940 as originally drafted followed the 1917 Act but was modified to provide a broader exemption. *See* 1966 Wis.L.Rev. 306, 311–13. The exemption as finally enacted in 1940 stated that no person would be subject to combatant training or service who "by reason of religious training and belief, is conscientiously opposed to participation in war in any form." 54 Stat. 885 (1940).

The 1940 statute was construed quite broadly in a series of cases beginning with United States v. Kauten, 133 F.2d 703 (2d Cir. 1943) in which Judge Augustus Hand said at 708:

"[T]he provisions of the present statute * * * take into account the characteristics of a skeptical generation and make the existence of a conscientious scruple against war in any form, rather than allegiance to a definite religious group or creed, the basis of exemption. * * *

\* \* \* \* \* \*

"There is a distinction between a course of reasoning resulting in a conviction that a particular war is inexpedient or disastrous and a conscientious objection to participation in any war under any circumstances. The latter, and not the former, may be the basis of exemption under the Act. The former is usually a political objection, while the latter, we think, may justly be regarded as a response of the individual to an inward mentor, call it conscience or God, that is for many persons at the present time the equivalent of what has always been thought a religious impulse."

This was followed by United States ex rel. Phillips v. Downer, 135 F.2d 521–523 (2d Cir. 1943) which granted a conscientious objector status to one who objected to war "on basic ethical and humanitarian grounds."

But in Berman v. United States, 156 F.2d 377, 381 (9th Cir. 1946), cert. denied 329 U.S. 795, 67 S.Ct. 480, 91 L.Ed. 680 (1946) it was held that a mere "philosophy of life * * * no matter how pure * * * and no matter how devotedly * * * adhere[d] to * * * without the concept of deity cannot be said to be religion in the sense of that term as it is used in the statute." The Court also quoted Chief Justice Hughes' definition of religion from United States v. Macintosh, 283 U.S. 605, 633–634, 51 S.Ct. 570, 75 L.Ed. 1302 (1931) (dissent), "The essence of religion is belief in a relation to God involving duties superior to those arising from any human relation." Berman, supra at 381.

The Selective Service Act of 1948, 62 Stat. 604 (1948), as amended, 50 U.S.C. App. § 451 (1964), then amended the 1940 Act, virtually adopting the language of *Berman* and Chief Justice Hughes' definition of religion by adding a definition of religious training and belief as "an individual's belief in a relation to a Supreme Being involving duties superior to those arising from any human relation, but * * * [exclud-

ing] * * * essentially political, sociological, or philosophical views or a merely personal moral code." § 6(j), 62 Stat. 612–13 (1948) as amended, 50 U.S.C. App. § 456(j) (1964.) The only change made in Chief Justice Hughes' definition of religion was to replace the word "God" with the phrase "Supreme Being." In addition the Senate Committee Report cited *Berman* in explaining its rewording of the Act. S.Rep.No. 1268, 80th Cong., 2d Sess. 14 (1948).

But in United States v. Seeger, 326 F.2d 846 (2d Cir. 1964) the registrant proclaimed no belief in a Supreme Being, although he did claim "a religious faith in a purely ethical creed" and an objection to war from a "practical [and] * * * moral standpoint." Id. at 848. Nevertheless the Second Circuit held at 854, "[A] line such as is drawn by the 'Supreme Being' requirement between different forms of religious expression cannot be permitted to stand consistently with the due process clause of the Fifth Amendment." That Court felt it was not only impermissible but impossible to draw a distinction between "internally derived and externally compelled beliefs" or to say a person who claims to be "obeying the dictates of his conscience or the imperatives of an absolute morality * * * is not bowing to 'external commands' in virtually the same sense as is the objector who defers to the will of a supernatural power." Id. at 853. Thus, the Second Circuit reversed Seeger's conviction in the District Court.

The Supreme Court in United States v. Seeger, 380 U.S. 163, 85 S.Ct. 850 (1965) affirmed the Second Circuit but did not accept the lower court's reasoning. The Supreme Court found no constitutional infirmity. Rather, the Court said, the denial of Seeger's claim in the District Court on the ground that it was not based upon a belief in a Supreme Being was incorrect. It was incorrect because the phrase "Supreme Being" was too narrowly construed.

Then explaining the use of the "Supreme Being" language in the 1948 Act the Supreme Court said at 165, 85 S.Ct. at 854:

"Congress, in using the expression 'Supreme Being' rather than the designation 'God', was merely clarifying the meaning of religious training and belief so as to embrace all religions and to exclude essentially political, sociological, or philosophical views."

The Court continued at 176, 85 S.Ct. at 859, saying that religious training and belief included,

"* * * all sincere religious beliefs which are based upon a power or being, or upon a faith, to which all else is subordinate or upon which all else is ultimately dependent. The test might be stated in these words: *A sincere and meaningful belief which occupies in the life of its possessor a place parallel to that filled by the God of those admittedly qualifying for the exemption * * *.*" (Emphasis ours.)

It is evident to us and to several commentators [1] that the Supreme Court gave broad meaning to the wording of the 1948 Act to avoid constitutional difficulties. Thus, the effect of the 1967 Act, which deleted the "Supreme Being" clause from the 1948 Act, is most unclear. If the intent, as stated by Congressman L. Mendel Rivers, Chairman of the House Armed Services Committee, was to narrow *Seeger* and return to the *Berman* definition of religious training and belief,[2] then the present Act has severe constitutional difficulties. However, Senator Russell, Chairman of the Senate Armed Services Committee, said the Senate did not accept the House explanation of the bill and in his opinion *the Act did not overrule Seeger.*[3]

---

1. 1966 Wis.L.Rev. 306, 319 and 4 Col.J. of L. and Social Problems 120, 153 (1968).

2. 113 Cong.Rec.H. 6285 (Daily ed. May 25, 1967).

3. 113 Cong.Rec.S. 8054 (Daily ed. June 12, 1967).

Furthermore, eliminating the "Supreme Being" clause was a curious way to attempt to overrule *Seeger*. A clearer and more appropriate method would have been to replace the phrase "Supreme Being" with the word "God." But instead of doing this, Congress eliminated any reference to God or a Supreme Being. It is therefore difficult to perceive this change as even narrowing the *Seeger* decision.

■ We believe that the 1967 Act in eliminating reference to a "Supreme Being" and retaining the "religious training and belief" clause has worked no change in the requirements for a conscientious objector classification, and the construction placed upon the 1948 Act in the *Seeger* case is the applicable standard.

The next question is whether the defendant, Levy, falls within the *Seeger* standard interpreting "religious training and belief" and thus qualifies for a conscientious objector classification.

■ The exemption is a matter of legislative grace and thus "[the] registrant[s] have the burden of clearly establishing a right to the exemption." *Dickinson v. United States*, 346 U.S. 389, 395, 74 S.Ct. 152, 157, 98 L.Ed. 132 (1953). Therefore, we must decide whether the information supplied to the Local Board by Levy is sufficient under the *Seeger* standard to meet this burden, or whether, on the other hand, he stated nothing which indicated more than a "merely personal moral code." [4]

■ The District Court decided, and the Government on appeal claims, that Levy's beliefs amount to "merely a personal moral code." But certainly Levy's statements to the Board, his active pursuit of a I-O classification, the testimony of the two clergymen, and the incident regarding the teen-age attack upon his friend, indicate that Levy's belief, ad-

mitted by the Government to be sincere, also "occupies * * * a place [in his life] parallel to that filled by the God of those admittedly qualifying for the exemption * * *."

In addition Levy always claimed his belief was a religious one and on December 20, 1967, perhaps due to the broader concept of "Supreme Being" set out in *Seeger*, felt able to claim belief in a Supreme Being, though not the "classical orthodox view of an omnipotent anthropomorphic God." As was said in *Seeger* at 380 U.S. 163, 184, 85 S.Ct. 863, "[I]t must be remembered that in resolving these exemption problems one deals with the beliefs of different individuals who will articulate them in a multitude of ways. In such an intensely personal area, of course, the claim of the registrant that his belief is an essential part of a religious faith must be given great weight."

Levy specifically quoted the noted theologian Paul Tillich in explaining his beliefs on SSS Form 150 in July 1964, and in *Seeger* the Government conceded that Tillich's views fall within the religious belief requirement of the statute.

The beliefs stated by Levy are strikingly similar to those of Dr. David Saville Muzzey of the Ethical Culture movement, which are set out in *Seeger* and by implication approved as religious. Both Muzzey and Levy speak of a horizontal religion of man to man, Muzzey speaking of the "ideal [as] a community of spirits", 380 U.S. at 183, at 862 of 85 S.Ct., and Levy discussing in essence a community of the human conscience, requiring men to do that which is right.

It appears also that Levy's beliefs are at least in part the result of religious training since he credits his parents with fostering many of his beliefs, and since as a child he was brought up in the Jewish religion and attended the synagogue often.

---

4. *Seeger* in interpreting the "merely personal moral code" phrase restricts that exception "to a moral code which is not only personal but which is the sole basis for the registrant's belief and is in no way related to a Supreme Being." 380 U.S. 163, 186, 85 S.Ct. 864.

On the other hand the Government contends that much of what the defendant has said in articulating his beliefs is equivalent only to a "personal moral code." But *Seeger* almost eliminated the "personal moral code" exception by restricting it to those situations in which it is "the sole basis for the registrant's belief." The Government points out, that although Levy claims the Supreme Being is manifested in his conscience, he does not claim conscience as the source of his beliefs. Levy stated that his conscience instructed him to act in accordance with those beliefs he thought right. These beliefs, the Government contends, are logically derived and represent merely Levy's general philosophy as developed at least in part from readings by him in the New Testament, and in works by Sir Bertrand Russell, Linus Pauling and Henry David Thoreau.

While the Government's position has some merit, it is not entirely well taken. In the first place, although some of Levy's beliefs may not wholly result from a belief in some Supreme Being or "inward mentor", nevertheless, at least one belief according to Levy is derived from some force or Supreme Being, and that is that he must act according to what he believes is right, and this obligation is greater than his obligation to secular authorities. Subtle distinctions of the type suggested by the Government would require a young registrant to state his beliefs (in an area in which views are admittedly difficult of articulation), with the care and precision of a trained theologian. Such fine distinctions should not be allowed to outweigh a registrant's avowal that his belief is truly religious.

The Government's reliance on the fact that Levy lists several literary sources for his beliefs, implying his beliefs must therefore be a product of logic and not faith, is also not well taken. SSS Form 150, § 2 required the registrant to indicate the source from which he acquired his beliefs. If we followed the Government's argument, only beliefs based solely on orthodox religious dogma or communion with God would survive the test of a religious source for a registrant's beliefs. Any literary sources, perhaps including the Bible, or any instruction from a human source could be viewed as merely contributing to the registrant's logical development of a personal philosophy. Furthermore, there seems to be no reason to make such a distinction. As was said by Brodie and Sutherland in their article, Conscience, The Constitution, and the Supreme Court: The Riddle of United States v. Seeger, 1966 Wis.L.Rev. 306, 329:

> "Nor should it be forgotten that religious beliefs, as conventionally understood, are often arrived at only through the exercise of reason; it is reason which brings some men to the point where they must posit the existence of a deity if all the conditions of life are to be satisfied and explained. But is the product of one man's unaided reason superior to another's because he chooses to call it religion rather than conscience or morality? And if not, what ground can there be, other than a verbal one, for distinguishing one reasoned conclusion from another? It seems ironical to discriminate against those who share one of man's highest impulses—an unwillingness to take the life of his fellow man—because it springs from reason, and not from the presumed command of some supernatural power."

It is clear from *Seeger* that the Supreme Court wished to do away with the practice of drawing either abstruse or for that matter self-evident distinctions between various religious beliefs. Admittedly the parallelism test of the *Seeger* case may significantly reduce the vitality of the personal moral code test, to the extent that pacifistic beliefs, if sincerely and deeply held may be defined as religious regardless of their source. *See* Douglas, J., concurring opinion in *Seeger*. Perhaps this is necessary to avoid constitutional objections. At any

rate it may be the most sensible approach. As stated by Brodie and Sutherland:

> "Separating one source of belief from another seems principally an exercise in conceptualism; certainly it is in the highest degree perplexing. No universally acceptable touchstone is known which enables one to separate religion from ethics or morals or philosophy, and the search for one is about as rewarding as efforts to square the circle."

It appears to us then that Levy's views meet the parallelism test of *Seeger* and are not "merely a personal moral code."

Several cases are also instructive in determining which beliefs meet the Supreme Court's parallelism test. Seeger himself had beliefs not qualitatively distinguishable from those of Levy and qualified for the exemption. Forest Peter, whose case was consolidated with Seeger's in the Supreme Court, had views very similar to Levy's and was found to qualify for the exemption.

In two recent district court cases, United States v. Shacter, 293 F.Supp. 1057 (D.Md.1968) and United States v. St. Clair, 293 F.Supp. 337 (E.D. N.Y. 1968) registrants with views substantially comparable to Levy's were found to qualify for conscientious objector exemptions.

The final issue with which we must deal is the Government's contention that at the very least, Levy's beliefs present a close question as to whether they are religious or a "merely personal moral code" and thus the conviction and the decision of the Local Board and the Appeal Board must be affirmed on the ground that such decisions have a basis in fact. Admittedly the vague standards set forth in the statute are most difficult to administer and the local boards are confronted with an almost impossible task. Any type of sincerely held belief opposing war generally would be difficult to rule out under *Seeger*. But what the Government is contending for is a literal and strict construction of the statutory exemption, which is not permissible under *Seeger*.

The case of Estep v. United States, 327 U.S. 114, 66 S.Ct. 423, 90 L.Ed. 567 (1946) established that the scope of review of an appellate court is limited to determining whether the local board's classification has a basis in fact. *Estep* has been followed without contradiction, one of the most recent cases being Vaughn v. United States, 404 F.2d 586 (8th Cir. 1968). Since the Government concedes Levy's beliefs were sincerely held, it must show that the Local Board had a basis in fact for deciding that Levy's beliefs amounted to "merely a personal moral code." And as we noted previously, in *Seeger* the Supreme Court held 380 U.S. at 186, 85 S.Ct. at 864, "the use by Congress of the words 'merely personal' seems to us to restrict the exception to a moral code which is not only personal but which is the sole basis for the registrant's belief and is in no way related to a Supreme Being." The Court explained this interpretation of the statute on the ground that they "construed the statutory definition [of religious belief] broadly and it follows that any exception to it must be interpreted narrowly." Apparently such an interpretation was necessary to avoid constitutional difficulties. Furthermore, in redrafting the Act of 1967, Congress made no effort to change the wording of the "merely personal moral code" section and thus it could be argued that Congress has acceded to this interpretation. At any rate the Government admits in its brief that "a moral code must be devoid of religious belief." We believe, under the Supreme Court's test of religious belief, it cannot be maintained that Levy's beliefs were devoid of religious content. They were at least in part religious and thus the Local Board had no basis in fact for its determination that Levy's beliefs amounted to a "merely personal moral code."

Reversed and remanded with direction to enter a judgment of acquittal.